**AFFIDAVIT**

I, Wyatt McCabe, being first duly sworn, do hereby depose and state as follows:

**INTRODUCTION**

1.    I am a sworn Task Force Officer (hereinafter "TFO") with the Bureau of Alcohol, Tobacco, Firearms and Explosives (hereinafter "ATF"). I am also a Detective with the Charleston Police Department (hereinafter "CPD") and have been so employed since July 2019. I am currently assigned to the ATF Louisville Field Division, Charleston, West Virginia Field Office.

2.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the forensic examination of a grey in color Apple iPhone in a black and clear case (hereinafter "TARGET DEVICE"), which is more fully described in Attachment "A," and the extraction from that property of electronically stored information described in Attachment "B."

3.    The contents of Attachment "A" and Attachment "B" to this Affidavit and application for a search warrant are hereby incorporated by reference.

4.    The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses.

5.     Because this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause for this warrant.

## STATUTORY AUTHORITY

6.     This investigation concerns alleged violations of federal law, including but not limited to violations of 18 U.S.C. § 922(g)(1) (Possession of a Firearm by a Convicted Felon); 18 U.S.C § 924(c) (Carrying a Firearm during and in relation to a Drug Trafficking Crime); and 21 U.S.C. §§ 841(a)(1) (Possession with Intent to Distribute a Controlled Substance).

## AFFIANT'S TRAINING AND EXPERIENCE

7.     Your Affiant is currently employed as a Detective with CPD and a TFO with the ATF.

8.     Your Affiant graduated from the West Virginia State Police Academy, where I learned basic criminal investigation techniques. I have a Bachelor of Business Administration in Economics and International Affairs from Marshall University in Huntington, West Virginia, and a Master of Divinity from Liberty University in Lynchburg, Virginia.

2

9.     Your Affiant has received investigative training, and has conducted and participated in investigations of violations of federal and state criminal laws, including those relating to firearms and controlled substances. These acts commonly involve the criminal use and transfer of firearms and illicit drug trafficking. I have also discussed with other law enforcement officers the methods and practices used by illegal drug distributors.

10.    In my current position as an ATF TFO assigned to the Charleston, West Virginia Field Office, my primary responsibilities include investigating individuals or groups who have committed violations of federal firearms and narcotics laws. Within that role, my job duties include, but are not limited to:

a.    Functioning as a case agent, which entails the supervision of specific investigations;

b.    Interviewing witnesses relative to the illegal trafficking of drugs and firearms and the distribution of monies and assets derived from these illegal acts;

c.    Functioning as a surveillance agent, which involves observing and recording movements of persons trafficking in drugs and firearms and those suspected of trafficking in drugs and firearms; and

d.    Drafting, obtaining, and executing search warrants.

3

## AFFIANT'S KNOWLEDGE OF CELLULAR TELEPHONES AND THEIR USE IN CRIMINAL ACTIVITY

11.    Your Affiant is personally, and professionally, familiar with cellular telephones or mobile telephones.

12.    I know that a cellular telephone or mobile telephone is a handheld wireless device used primarily for voice and text message communications between parties in remote locations.

13.    I am aware that cellular telephones usually include a "call log," which records the telephone number, date, and time of calls made to and from the phone.

14.    In addition to enabling voice communications, I know that cellular telephones now offer a broad range of functions, which include, but are not limited to: storing names and phone numbers in electronic address books or contact lists; sending, receiving, and storing text messages and emails; taking, sending, receiving, and storing still photographs and moving videos; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; accessing and downloading information from the internet; and sending, receiving, and storing GPS coordinates of a phone's location.

15.    Based on my knowledge, training, and experience, I know that cellular phones, such as the Apple iPhone described in Attachment "A," can store electronic information for long periods

4

of time.   This information can sometimes be recovered with forensics tools.

16.   Based on my knowledge, training, and experience, I know that it is a common practice for drug traffickers to use and keep cellular telephones to facilitate their drug trafficking activities. Cellular telephones allow drug traffickers to remain in close and nearly instantaneous communication with their customers and suppliers.

17.   Based on my knowledge, training, and experience, it is common for cellular telephones used by drug traffickers to contain evidence of drug trafficking.  This evidence includes call logs, text messages, stored emails, contact lists, photographs, and video images of drugs and firearms, drug proceeds, and drug trafficking paraphernalia and activity, and other information. It is also common for individuals to use cellular telephones to obtain and to facilitate obtaining illegal drugs and firearms.

18.   Based on my knowledge, training, and experience, I know that individuals use cellular telephones to communicate with their illegal drug sources and coconspirators as it pertains to drug trafficking and firearm possession.  These devices may possess information for how illegal drugs and firearms are acquired and may identify other coconspirators known and unknown.

19.   Based on my knowledge, training, and experience, I know that the electronic memories of cell phones, including social

media applications, have been found to contain evidence of illegal firearm possession, including communications regarding when and how an illegal firearm was obtained, who obtained the illegal firearm for the possessor, and the motivation for possessing the illegal firearm.

20.   Based on my knowledge, training, and experience, I know that individuals who illegally sell or possess firearms frequently take or cause to be taken photographs or other images of themselves in possession of firearms, their associates, their property, and assets with cellular telephones. They also frequently utilize cellular telephones to communicate with other individuals to purchase or sell firearms.

21.   Based on my knowledge, training, and experience, I know that cellular telephones contain information that identifies the owner or user of the cellular device.

22.   Based on my knowledge, training and experience, I know that individuals involved in drug trafficking communicate with each other on social media applications, such as Facebook, Snapchat, Instagram, WhatsApp, etc. I also know that individuals will often set up dates and times for illegal drug deals on social media applications such as Facebook Messenger and WhatsApp.

**PROBABLE CAUSE**

23.    On  August  21,  2024,  Charleston  Police  Officers
(hereinafter  "Detectives")  assigned  to  the  Special  Enforcement
Unit  (hereinafter  "SEU")  went  to  409 ½ Wyoming  Street,  Charleston,
Kanawha  County,  West  Virginia,  at  approximately  10:05 p.m.  SEU
Detectives  received  information  earlier  that  day  that  illegal
drugs  were  being  distributed  from  this  residence,  and  Detectives
traveled  there  to  investigate.  Detective  B.  Rinehart  and  your
affiant  were  dressed  in  plain  clothes  and  traveled  to  the
residence  in  an  unmarked  vehicle.

24.    Detective  B.  Rinehart  and  your  affiant  were  on  foot  near
the  front  of  409 ½ Wyoming  Street,  Charleston,  Kanawha  County,
West  Virginia,  when  a  male  (later  identified  as  Jerry  Lamonte
GREEN,  hereinafter  "GREEN")  emerged  from  the  back  of  the
residence.  GREEN  was  pushing  a  bicycle  as  his  feet  straddled  its
frame  when  Detective  Rinehart  and  I  made  eye  contact  with  him.
Detective  Rinehart  and  I  were  approximately  12  feet  from  GREEN
when  eye  contact  was  made.

25.    It  should  be  noted,  on  or  about  August  20,  2024,  your
affiant  saw  GREEN  standing  in  front  of  409 ½ Wyoming  Street,
Charleston,  Kanawha  County,  West  Virginia.  At  the  time,  your
affiant  was  on  routine  patrol  in  an  undercover  vehicle.

26.    When  GREEN  looked  at  Detective  Rinehart  and  your
affiant,  he  immediately  exclaimed,  "Oh,  fuck!"  GREEN  suddenly

7

jumped on the bicycle and began to ride at full tilt in the opposite direction from Detectives.

27.    Detective Rinehart identified us as police officers and yelled at GREEN to stop.  Without looking back, GREEN responded, "Fuck that," and continued to vigorously flee on his bicycle. GREEN crossed Wyoming Street, ditched the bicycle, and began running on foot through a residential neighborhood.

28.    Your affiant began to pursue GREEN on foot.  Your affiant saw GREEN jump a fence into the yard of 414 Wyoming Street, Charleston, Kanawha County, West Virginia. As GREEN continued running through the yard, your affiant saw GREEN appear to dig into his front waistband area and front pockets with his hands in a manner consistent with him trying to remove an object or objects. As your affiant continued to pursue GREEN from behind, there was little artificial lighting to illuminate the yard as GREEN'S hands went to his front waistband area.

29.    GREEN ran from the yard into an alley that ran parallel to Wyoming Street.  Your affiant pursued GREEN on foot.  GREEN ran approximately 50-100 yards in the alley.  GREEN then jumped a fence into the yard of another residential home as GREEN ran back toward Wyoming Street. Green jumped a third fence into the yard of a residence located at 406 Wyoming Street, Charleston, Kanawha County, West Virginia, where your affiant was able to catch and subdue GREEN. It should be noted, during the pursuit,

8

your affiant repeatedly identified himself as a police officer and ordered GREEN to stop. GREEN repeatedly ignored your affiant.

30.    It should further be noted, based on your affiant's knowledge, training, and experience, individuals will flee from police officers without provocation to discard illegal drugs or firearms in their possession in an effort to avoid detection.

31.    Approximately 25.32 grams of a substance that field tested positive for fentanyl was recovered in GREEN's pants pocket. A second bag was recovered from GREEN that contained approximately 0.79 of a substance that field tested positive for MDMA. Your affiant knows that the quantity of suspected Fentanyl possessed by GREEN is consistent with distribution and not personal use.

32.    Within minutes after GREEN was subdued, Charleston Police Department Patrol Officers assisted your affiant with retracing GREEN'S flight path. Officers and your affiant returned to the yard of 414 Wyoming Street, Charleston, Kanawha County, West Virginia, where GREEN was seen placing his hands in his front waistband area as your affiant pursued him. In the yard, a loaded Taurus Millennium PT111 9mm pistol was recovered, along with a bag that contained a substance that weighed approximately 3.60 grams that field tested positive for fentanyl. Also in the yard, directly in GREEN's flight path, an Apple iPhone was recovered

(further described in Attachment A).  It should be noted that fentanyl is a Schedule II Controlled Substance.

33.    Your affiant knows that drug traffickers possess firearms for several reasons including, but not limited to, repel a perpetrator's attempt to rob them of their illegal drugs or drug proceeds, to deter robbery attempts, to "motivate" customers to pay for illegal drugs in a timely manner and to deter drug sources from selling them "sham" drugs or drugs of an inferior quality.

34.    GREEN was convicted in the Cuyahoga County Common Pleas Court of the felony offense of Involuntary Manslaughter on or about July 23, 2002.  In addition, GREEN was convicted in the Cuyahoga County Common Pleas Court of the felony offense of Attempted Aggravated Assault on or about September 24, 2016.

## CUSTODY OF THE CELLULAR TELEPHONE

35.    The TARGET DEVICE described in Attachment "A" was seized by SEU Detectives on August 24, 2024.  After the TARGET DEVICE was seized, it was taken to the Charleston Police Department's SEU Office, where it was logged into evidence and has remained since that time.

36.    In my training and experience, I know that the TARGET DEVICE has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the

10

same state as it was when the TARGET DEVICE first came into the possession of law enforcement.

## NATURE OF THE EXAMINATION

37.    There is probable cause to believe that evidence that was once stored on the TARGET DEVICE will still be stored there, for at least the following reasons:

    a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is because when a person "deletes" a file on a cell phone, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space for long periods of time before they are overwritten.  "Free space" or "slack space" refers to space on the storage medium that is not currently being used by an

11

active file. Additionally, a cellular phone's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory, or "cache."

38. As further described in Attachment "B," this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described in the warrant, but also forensic evidence that establishes how the TARGET DEVICE was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence is on the TARGET DEVICE because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.

b. Forensic evidence on a device can also indicate who has used or controlled the device.

      c.    A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

      d.    Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, it is sometimes necessary to establish that a particular item is not present on a storage medium.

39.    Based on the foregoing, and consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, the warrant I am applying for would permit the examination of the TARGET DEVICE consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

40.    Because this warrant seeks only permission to examine a cellular device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is

reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

**CONCLUSION**

41.   Based on my training and experience, and the facts set forth above, I believe there is probable cause that evidence of criminal violations of federal law, including but not limited to violations of 18 U.S.C. § 922(g)(1) (Possession of a Firearm by a Convicted Felon); 18 U.S.C § 924(c) (Carrying a Firearm During and in Relation to a Drug Trafficking Crime); and, 21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute a Controlled Substance), will be found on the TARGET DEVICE.

42.   WHEREFORE, your Affiant submits that this affidavit supports probable cause for a search warrant authorizing the examination of the TARGET DEVICE to seek the items described in Attachment "B."

Further your affiant sayeth naught.

Wyatt McCabe
Task Force Officer, ATF

Sworn to by the affiant telephonically in accordance with the procedures of Rule 4.1 of the Federal Rules of Criminal Procedure this the  1st  day of October, 2024.



Omar J. Aboulhosn
United States Magistrate Judge

14